IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>REESE LIGHTNER<br>a/k/a "Reece Lightner" | Case No. 1:26mj90ML |

## CRIMINAL COMPLAINT AFFIDAVIT

I, Brett Heil, being a duly sworn and appointed Special Agent for the Federal Bureau of Investigation (FBI), hereby make the following statement in support of the attached criminal complaint.

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been since September 2017. I am currently assigned to the Jacksonville Field Office, Gainesville Resident Agency. I have previously been assigned to the New Orleans, Louisiana Field Office. My duties and responsibilities have included investigating cyber-crime, white-collar crime, domestic terrorism, and crimes against children. I have also assisted in the prosecution of those crimes.

2. The information set forth in this affidavit is based on my personal knowledge, as well as information obtained from other sources, either involved in the investigation or who have personal knowledge of the facts herein. Because this

FILED USDC FLND GV
OCT 8 '26 PM12:39

affidavit is submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation for this affidavit. Rather, it only includes the information necessary to support a finding of probable cause.

3. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud) have been committed by Reese Lightner, and other co-conspirators.

## PROBABLE CAUSE

4. In early May 2026, **Victim 1** (an elderly female) received an email claiming to be from Amazon. The email indicated there was a problem with her Campus USA bank account, and that she needed to call a phone number provided in the email. When she called the number, she spoke with "John Harris" from Campus USA, who told her that her identity had been stolen and that her Social Security Number (SSN) was compromised. Harris then directed **Victim 1** to contact an "Agent" from the "Federal Trade Commission" (FTC) named "Michael Chappell." **Victim 1** telephonically contacted Chappell, who told her that numerous people had used her SSN, some of whom used it for drug deals and other illegal acts.

5. Chappell told **Victim 1** that in order to clear her name and receive a new SSN, she would need to make financial payments to the U.S. Government. Chappell got **Victim 1** to divulge the amount of money in her Campus USA checking account, which was a little over $100,000. Chappell then directed **Victim 1** to write a check for the full amount in her checking account and use it to purchase gold bars from a local gold and jewelry dealer.

6. **Victim 1** identified a Gainesville-based gold dealer and used a check to purchase 21 gold bars, worth $101,220. Chappell subsequently directed **Victim 1** to put the gold in a box, along with a piece of paper containing her name, address, and an "FTC ID Number" she was given by Chappell. **Victim 1** was then instructed to take a photo of the items and send it to Chappell. **Victim 1** was told that somebody from the Treasury Department would be coming to her house in McIntosh, FL, to pick up the gold on or about the morning of May 16th.

7. On or about the morning of May 16th, the Treasury Agent did not appear at **Victim 1's** house at the agreed-upon time. Shortly thereafter, Chappell called **Victim 1**, who told her that the Treasury Agent deemed the neighborhood unsafe, and asked that **Victim 1** instead meet the Agent at a local Sunoco gas station that was a few miles from her house.

8. While on the phone with Chappell, **Victim 1** drove to the Sunoco. When she arrived, Chappell had her text him a photo of herself and her car at the

gas station. Soon thereafter, an unknown male subject (UNSUB) wearing a mask pulled up in a light grey Volvo sedan. The UNSUB gave **Victim 1** the code word "butterfly," which Chappell had given her ahead of time. **Victim 1** put the box of gold in the car and the UNSUB drove away.

9. On approximately May 18th, a few days after the initial gold drop-off at the Sunoco, Chappell contacted **Victim 1** and told her more money would be required. **Victim 1** told Chappell that she had close to $500,000 in a J.W. Cole investment account, which was managed by Cornerstone Financial Group (CFG) in Gainesville, FL. The $500,000 represented almost all of **Victim 1's** remaining life savings.

10. Chappell directed her to transfer that money to her Campus USA checking account, again use the funds to buy gold bars, and provide status updates. Chappell also told **Victim 1** that it was very important that she not tell anyone about what was going on.

11. Prior to **Victim 1** transferring her funds and procuring the next batch of gold bars, a concerned citizen who was aware of **Victim 1's** prior gold purchase contacted the FBI. The FBI subsequently contacted and interviewed **Victim 1**, who provided the above-referenced information. The FBI notified **Victim 1** that she

was being defrauded, and **Victim 1** agreed to assist the FBI in identifying/apprehending subjects of the ongoing fraud.

12. At the direction of the FBI, **Victim 1** indicated to Chappell that she had transferred approximately $500,000 in gold from her investment account to her Campus USA account and had subsequently used the funds to procure $497,229 worth of gold (107 1-ounce gold bars). After notifying Chappell that she had procured the gold bars, Chappell scheduled another transfer of the gold from **Victim 1** to the aforementioned "Treasury Agent" on June 1, 2026.

13. On June 1, 2026, the FBI arrested Gurpinder Singh ("Gurpinder"), the individual who attempted to pick-up the gold from **Victim 1**.

14. Subsequent investigation by the FBI corroborated Gurpinder's role as a courier for the fraud scheme and revealed further evidence that Gurpinder was part of an active cell of U.S.- and India-based co-conspirators who coordinated with each other using their cellular devices to repeatedly execute the above referenced fraud scheme, in addition to a related fraud scheme in which victims were convinced to mail packages of cash to the fraudsters. Three of those co-conspirators were identified as Sierra Stites ("Stites"), Carissa Snow ("Snow"), and Reese Lightner ("Lightner") whose connection to, and participation in, the overarching fraud scheme was identified as follows:

**Interview of Gurpinder Singh**

15. On June 22, 2026, Gurpinder was interviewed by investigators. The interview was audio and video recorded. Post-*Miranda*, Gurpinder explained that he lived in Bakersfield, California, and was first contacted about going to Florida to conduct the aforementioned pick-up from **Victim 1** by his friends Yashdeep Singh ("Yashdeep") and Navjeet Singh ("Navjeet"). Navjeet paid for Gurpinder's flight to Florida while Navjeet's brother, Kuljeet Singh ("Kuljeet") gave Gurpinder $1,000 in cash.

16. Once Gurpinder arrived in Florida, he received a WhatsApp call from someone who identified himself only as "Tom." Tom, who Gurpinder believed to be based in India based on their subsequent conversations, was provided Gurpinder's contact information by Navjeet, and Tom instructed Gurpinder on what to do and where to go during the time period of the attemped pick-up from **Victim 1**.

17. Gurpinder stated that had he picked up the package of gold from **Victim 1** he was instructed to bring the gold to Navjeet in New York, where he was to receive $5,000 for acting as the courier. Gurpinder further stated that he knew these activities were illegal and that Tom, Navjeet, and Kuljeet were all in on the scam.

**Review of Kuljeet Singh's Cellular Device**

18. On July 16, 2026, the FBI contacted Detective Ryder of the Bakersfield (CA) Police Department (BPD) related to a local arrest report involving Kuljeet at address 11717 California Poppy Drive, Bakersfield, CA 93311. The report indicated that on June 27, 2026, Kuljeet was arrested following a search warrant conducted at the above-listed address, during which law enforcement identified unregistered guns belonging to Kuljeet, as well as a large number of UPS packages.

19. Pursuant to the search and arrest, BPD seized Kuljeet's phone, an iPhone 17 assigned call number 661-564-1446, and on July 17, 2026, the Honorable United States Magistrate Judge Midori A. Lowry signed a search warrant for the device.

20. A review of the device revealed messages between Kuljeet and co-conspirators involved in the two aforementioned fraud schemes (detailed further below), which targeted elderly victims in the United States. The messages included conversations with the India-based fraudster "Tom" via the same WhatsApp number that Tom had used to communicate with Gurpinder.

21. The first fraud scheme, as described in the sections related to Gurpinder and **Victim 1**, involved India-based subjects posing as federal agents and/or United States federal judges to convince elderly victims to liquidate their

assets into gold and then transferring the gold to U.S.-based couriers who they also believed were federal agents. Afterwards, the couriers would pass the gold on to receivers, who would launder the proceeds back to other conspirators in different locations, including India. In multiple instances in Kuljeet's conversations with Tom and other members of the conspiracy, they discussed and coordinated the pick-up and drop-off of gold, and sent photographs of gold bars and coins. This included, for instance, Tom telling Kuljeet he needed someone to travel to Florida for a gold pick-up, and then Kuljeet and Navjeet coordinating Gurpinder's travel to Florida for the pick-up associated with **Victim 1**.

22. The second scam also involved the same India-based fraudsters duping U.S.-based victims into liquidating their assets, but in this instance the victims were instructed to send the cash to various addresses in and around Bakersfield, California, which were controlled by Kuljeet and other, U.S.-based members of the fraud scheme. In dozens of instances, I reviewed text messages between Kuljeet, Tom, and other members of the conspiracy, in which the members shared detailed information about an incoming package – to include tracking numbers, recipient name and address, sender name and address, and the associated dollar amount. Once the package arrived, Kuljeet, among others, would take a video of themselves opening the package, revealing and counting the cash, and then sending the video to Tom to confirm receipt.

23. The FBI conducted research into the individuals listed as the senders of the packages and discovered they were virtually all elderly, and that some of them had already filed police reports about being defrauded into handing over gold and/or sending cash through the mail.

24. The FBI also conducted research into the recipient names on the packages, which were most frequently listed as either "Sierra Snow" or "Carissa Snow." Neither a "Sierra Snow" or a "Carissa Snow" had any apparent connection to the addresses the cash packages were being sent to. However, further review of Kuljeet's phone, as well as evidence from a separate FBI investigation, revealed that Stites and Snow were connected to the fraud scheme via both Kuljeet and Tom.

**<u>Zelle Payments to Sierra Stites</u>**

25. On at least four occasions, Tom instructed Kuljeet to make payments on his behalf via Zelle to an account tied to phone number 386-337-6037 and the name "Sierra". The FBI subsequently obtained records from Zelle that indicated that this account belonged to Stites. In one instance, on June 8, 2026, Tom added up a series of cash packages that had just been received from victims, which totaled approximately $119,000. Tom then told Kuljeet to keep 3% of the funds and send the rest to the Zelle account tied to Stites.

26. Stites received at least one Zelle payment from Kuljeet and at least two payments from Akashdeep Singh ("Akashdeep"), another identified co-conspirator who lived at the same address in Bakersfield, California as Kuljeet, Navjeet, and Yashdeep. Although Akashdeep sent two of the payments to Stites, as stated above, all of the instructions to send funds via Zelle came from Tom and were directed to Kuljeet to send the funds. It should be further noted that although Gurpinder never mentioned Akashdeep sending him Zelle funds during his interview, Zelle records and bank records confirm that while Gurpinder was in Florida to pick up gold from **Victim 1**, Akashdeep also sent Gurpinder funds via Zelle. According to records obtained from Zelle, the following transfers took place:

- 05/29/2026 Kuljeet sent Stites $2,500.00
- 05/29/2026 Akasdeep sent Stites $2,000.00
- 05/29/2026 Akashdeep sent Gurpinder $1,000.00
- 06/02/2026 Akashdeep sent Stites $1,900.00

27. Based on my experience with other elder gold fraud schemes as well as evidence already obtained from other gold couriers in this investigation, these dollar amounts are consistent with the fees paid to runners for participating in the fraudulent activity as well as for covering some of the expenses occurred when runners travel.

**FBI Milwaukee Investigation**

28. After identifying the payments to Stites, the FBI searched her name across FBI case files and identified an FBI Milwaukee gold courier fraud case involving Stites and Snow.

29. The FBI Milwaukee case was initiated after Snow was arrested, along with her boyfriend Reese Lightner ("Lightner") on May 27, 2026, by local police in Wisconsin while attempting to pick up a package of gold from a local elderly victim (**Victim 2**), who had already been defrauded out of approximately $621,895, and who was planning to provide the couriers, Snow and Lightner, an additional $380,000 in gold.

**Review of Carissa Snow's Phone**

30. Following the arrest of Snow and Lightner, local police obtained a search warrant for both of their phones, a copy of which was provided to FBI Milwaukee and, subsequently, to the Gainesville FBI.

31. A review of Snow's phone by the FBI corroborated her, Lightner's, and Stites' involvement in the same fraud scheme/network as Kuljeet and Tom.

32. For example, on March 8, 2026, Stites and Snow had the following conversation, in what appeared to be Stites initial recruitment of Snow as a courier:

a. Stites: You wanna go to Chicago. And do jobs for me.
b. Snow: When. Yes.

c. Stites: Don't tell anyone. You got a license.

d. Snow: What kind of job. Yes.

e. Stites: The driving thing. Do not say a word.

f. Snow: Ok

g. Stites: Even to Reese.

h. Snow: Lips sealed. How much. Ok but I can't go without telling him.

i. Stites: I can get you at least 10 g a month.

j. Snow: Ok

k. Stites: Message me on WhatsApp

33. A review of Snow's WhatsApp communications revealed numerous WhatsApp calls between Snow and Stites, as well as Snow and Tom. Available data from Snow's phone showed that her WhatsApp communications with Stites and Tom occurred from at least May 1, 2026 – May 27, 2026. Further, Snow's WhatsApp communications with Tom were via the same phone number utilized by Tom to coordinate the fraud with Gurpinder, Kuljeet, and other members of the conspiracy.

34. Text messages between Snow and her boyfriend, Lightner, further revealed that they were working for Tom and Stites. For instance, on May 14, 2026, Lightner texted Snow:

> You should talk to Tom and tell him that I packed my shit and left. Ask him what you should say to me as to when and where I can meet you bc if you dont tell me something youre gonna end up losing me

> and youre not willing to lose me over the job…and then threaten to quit if hes not gonna answer you… Stand your ground carissa. Stop letting your "best friend" and this sand nigger do this to us…I would have already put Sierra in her place about all the shit talking carissa.

35. Later that day, Lightner texted Snow, "I'm finishing a run so I cant talk to you bc I get too emotional." Lightner and Snow frequently discussed "runs" in the context of gold pick-ups.

36. On May 17, 2026, Lightner texted Snow "And duce I told you to fucking handle Tom. He literally called me and said im working Florida and youre working Chicago." After which, Snow told Lightner to just come to Chicago and meet her there. She then texted "500. Half job," indicating that her and Lightner could split the profit from an upcoming pick-up. Later, Snow texted Lightner, "The plan is that I'm going to Missouri and then I wanna say Texas and then Louisiana. I don't know what the last one is before I go to Chicago so I was thinking… So I was thinking that we would spend the night together tonight and then you would head back because you need to be there to do your runs in Florida and then you would meet me again in two days in Louisiana and then we'll go together to Chicago."

37. On May 21, 2026, Lightner texted Snow (referring to Tom), "Tell him since hes utilizing me that when we link up I will be with you from now on and that its no longer up for debate if he want you to continue running for him."

38. Messages and calls related to the gold pick-up attempted by Snow and Lightner on the day of their arrest, May 27, 2026, further confirmed their involvement in the scheme and Stites' and Tom's role as their handlers. For example, on the morning of May 27, 2026, though it appears to have been deleted from her phone, Snow indicated that Tom texted Snow a zip code where the gold pick-up was to occur – much as he had done with other co-conspirators prior to gold pick-ups. Over the next two hours following that alleged text message from Tom, data from Snow's phone revealed 12 attempted WhatsApp calls from Tom to Snow, and one from Stites. Stites then sent Snow a message stating, "*wakes wakes. Works calling*." Shortly after that message, Snow called Stites and then Tom. Snow then proceeded to have numerous communication events with Tom and Stites leading up to Snow's arrest.

39. Later in the day, Snow and Lightner shared numerous text messages in which they were fighting about Snow picking Lightner up in the vehicle she was driving. At one point, Snow appeared to leave Lightner without picking him up, to which Lightner responded that if she did not turn around and pick him up he would call the police and tell them everything. At 12:40pm, Snow placed an outgoing call to Lightner. Soon thereafter, Snow and Lightner were arrested attempting to conduct the gold pick-up from **Victim 2**.

40. Notably, the police report associated with Snow's and Lightner's arrest indicated the two were driving a black Chevrolet Equinox bearing license plate number 9UOW032 when they attempted to conduct the gold pick-up from **Victim 2**. Publicly available records identified the vehicle as a rental car associated with Enterprise Rent-A-Car. The FBI subsequently obtained Enterprise records related to the vehicle, which revealed that Stites had booked and paid for the rental.

**Lightner Interview**

41. When Lightner was arrested on May 27, 2026, he provided a post-*Miranda* interview. He advised that he was communicating via WhatsApp with an unknown male from India named "Tom," who was going to pay him $1,000 for picking up the package. Lightner said he and Snow asked what was in the package, but Tom would not provide an answer. Lightner provided additional details about his travel and the circumstances leading up to his arrest. Lightner acknowledged he had concerns about the situation and stated, "it was Indian and I knew better," but also stated Tom was promising money and that he and Snow were arguing about finances.

**Prior Incident**

42. Approximately one week prior to his arrest, on May 22, 2026, at approximately 12:47:13 PM CDT, Lightner sent Snow a message stating, "Take

the gold and run." This message is significant because Lightner specifically referenced "the gold" on the same date he was detained by Madison Police during a scam-related gold pickup operation. This message occurred after police in Madison, Wisconsin advised Lightner that he was attempting to pick up approximately $400,000.00 in gold coins from a victim of a scam.

## CONCLUSION

43. Based upon the foregoing, there is probable cause to believe that Reese Lightner did knowingly and willfully conspire to participate in a fraud scheme using wire communications in interstate commerce, in violation of Title 18, United States Code, Section 1349.

Brett Heil

Brett Heil, Special Agent
Federal Bureau of Investigation
Gainesville, Florida

Sworn to and subscribed before me
via telephone this 8th day of October 2026.

Midori A. Lowry

Midori A. Lowry
United States Magistrate Judge